Okay. Our next case for argument is Lumens v. GoEco LED. Good morning, Your Honors. Hold on. Is there one second? Just one second. Wait for other counsel to get seated. It's new to me. Okay. Good morning, Your Honors. Ray Bordelon representing GoEco, and I would like to reserve four minutes for rebuttal. Sure. Before this court, our issues of law largely residing within two general areas. First was the summary award of Lumens damages claims proper, and second was the summary dismissal of GoEco's claims proper. In the district court's December 1, 2015, order, six of GoEco's torts were maintained, three with prejudice to Lumens. At the same time, the court awarded Lumens its damages on the theory that 13 invoices actually constituted 13 contracts. The district court concluded that even if Lumens breached the parties' agreements or acted tortuously or maliciously, which GoEco is claiming, those wrongs were entirely separate and apart from the 13 invoices. Several years later, in its January 3, 2018, award order, the district court appears to recognize the fact that GoEco could, in fact, show damages, or rather the fact of damages is there. But they ruled that there is no basis for the trial fact to determine the extent of GoEco's damages. What kind of damages was GoEco seeking? Oh, various damages, interference with contracts, relationships, prospective loss, specialty, one of the biggest lighting companies in the country was one of GoEco's accounts. You were seeking lost profits on future? Lost, yeah, damages, loss according to UCC. How were you going to measure the damages? Well, you have a history, Your Honor, on what specialty was purchasing, and of course we already have $100,000 in damages as a regard of Juno, which they circumvented GoEco and only paid that $100,000 after all this litigation was in process. The $100,000 was based on the commission for the city of Juno, correct? Right, yes, Your Honor. And the district judge offset that in the award, correct? He did. Correct. So that was recovered. And as I understand the record, the Lumens came up with the amount of money for the commission. They provided the basis for that amount, not GoEco. I'm not sure. I don't follow you, Your Honor. They had certain sales of component parts to Juno. Juno was acquired by GoEco. Now, a GoEco account, John Cho, who wore two hats, he was also the president of a competing lighting company, he was looking, Cho and Brian Kim were salivating with regard to Juno, thinking it was super big and they could sell him directly and cut us out. So they went around us, but of course they finally had to agree that, hey, they couldn't do that. So the $100,000 was lost. Yes, we actually recovered it, but I'm under the understanding that even though it was recovered, this was something that was wrongfully done by them, and GoEco would at least, with respect to that $100,000, if nothing else, be able to request punitive damages. Well, you owed them over a million dollars, though. Excuse me, Your Honor? I said you owed them over a million dollars. Well, it was, as far as what GoEco withheld, it was a little over $300,000, and they did that under color of law because there was much, much reason for anyone reviewing a record to believe that Lumens breached first, and seriously. They had two people in- How much can you run up without paying before they say, hey- Well, they had a million five, they had a million five in credit. Now, specialty was also involved, and because in late May and early April, Lumens had indicated they would no longer ship. John Cho and Brian Kim came in control of the lighting department. Chong was there before and had a very good relationship with GoEco. Brian Kim and Cho, Cho being a very, very good friend per his deposition, like a buddy that you can't believe. Americans don't understand how tight they are. They took control of the shipping department, and they refused to ship. Specialty needed these things very seriously. It was urgent, according to what specialty told us. I mean, I can't vouch for that, but that's what they said. So specialty withheld $730,000 of that amount, and they just recently paid it after the award, about four months after, and that's because they were probably tired of it, and Lumens went into an agreement with them, but specialty only paid because Lumens waived any right to that 10% prejudgment interest, and they also agreed that they would pay for any defense that has to be done in connection with a GoEco suit against specialty, and if any award issued against specialty, Lumens would pay that award. That's the only reason they turned it over. Yep. So the way this worked is various lighting company or installers like specialty or Juno would need lighting. They'd order it through GoEco, who would then order it from Lumens. Lumens would ship it directly to Juno or specialty or the other entity. Correct, Your Honor. And then that entity would pay GoEco, who would then pay Lumens? On Juno, Juno paid Lumens directly, and then we were supposed to get the commission. What about specialty? Specialty, no. They had an obligation to pay us. They had an obligation to pay GoEco, right? That's right, GoEco. So they didn't pay. Why do you have a claim against Lumens when specialty didn't pay GoEco? Oh, the claim is because they, in effect, in GoEco's humble opinion, they maliciously, it wasn't accidental. In our opinion, it's not like a garden variety breacher contract where somebody made a mistake, a difference in interpretation. Mr. Cho, and I think the pleadings show this very, very well, Mr. Cho and Mr. Kim, without question, when they came on board in late 13, they wanted GoEco out. And this is after GoEco spent over a year developing the U.S. market for them and obtained Juno, one of the largest in the country, and also specialty. They also had DSL in New York. I mean, GoEco did a marvelous job. They succeeded beyond belief. And they were looking to prospective benefits, you know, benefit of bargain, and suddenly they're going to be cut out of all of that. So your argument is that specialty ordered and received lighting and didn't pay for it, and they didn't pay because of Lumens' bad actions. That's right, Your Honor. So GoEco decided to sue Lumens over that rather than suing specialty who owed them the payment. Well, you know, specialty and Lumens were on the same page, or so we thought. I mean, the belief was that Lumens was flat out not wanting to live up to the contract. It's our opinion that's a requirements contract, and the judge has not ruled this out. He said the district court couldn't say whether it was or wasn't, but he definitely said the nature of the MRU is up to the trier of fact. He can't touch that. He said if he tried to touch that, this Ninth Circuit would overturn him in a nanosecond. So he left that net open. So that's what he said, Your Honor. I don't think the court's that efficient. Has the court ever reversed anything in a nanosecond? Maybe five or six seconds. I'm just quoting him, Your Honor. No, I know these courts. I'm amazed at the time they take and how astute and how much they get into detail. It still blows my mind. But anyway. One of your arguments is that the district court erred by not applying the California UCC to the MRU. Right, Your Honor. So can you elaborate on that? Why was the district court an error? What made this MRU the type of contract that the UCC would apply? Because it was a contract for the sale of goods. You know, it was GoECO. But it had no terms for the sale of any goods. It appears to be a services contract where GoECO is going to procure customers for lumens. So how does this – what in this MRU makes it a contract for the sale of goods? Well, because GoECO and lumens long got together. And there's a history of selling the goods. I mean, GoECO put in the orders, you know, from specialty, for example. And specialty would – lumens would fill the orders. And, of course, they'd be shipped to specialty. So GoECO was in a position to act as an agent for what would seem to me, you know, the sale of goods. You know, it's much more than just a service. And a reading of a complete Article 2 of the UCC – and maybe I'm wrong, but the reading of it is that everything involved in this, even if you don't have particular terms and whatnot, it's not detrimental, that it can still be viewed as a contract for the sale of goods. And that was never contested, Your Honor. And that has been our position from the start. And to my knowledge, it was never contested. The parties proceeded as though it was. And even Appellee's first attorney, you know, they went right off saying, hey, this is all based on the MRU, which is a valid and enforceable contract. Well, that's different from saying that the UCC applies to it. So assuming the UCC applied and the district court erred by not finding that to be the case, what difference does that make? How would it have been different? For the UCC? Well, under the UCC, you'd get the prospective damages. You'd get just about all the damages that you could reasonably show. You wouldn't even have to be extremely precise under the UCC. It's the price you paid for it and the price you got for it. And you subtract to it, and then that's your net return. And according to the UCC, you know, that's the measure of damages. The district court found that GOECO wasn't able to provide that evidence. Well, district court seemed to believe that evidence that had to be provided was such that couldn't be done to the extent necessary. But it's GOECO's position that, according to UCC, you don't have to go into all the detail. It's simply the price you paid for it, the forward price, you subtract it to, and that's what a jury can decide on, subtracting maybe a little here, a little there for whatever expense that would be taken out of that. But GOECO is a firm, is an agent. I mean, they were de minimis. They didn't have trucks. They didn't have a warehouse. None of that. It was basically cell phones, computers, and that's how they could do their business. Do you want to save some time for rebuttal? Oh, I think I said four minutes. Okay, well, you're down to three, so why don't we let the other side. Thank you, Your Honor. Okay, you got three. Thank you. You can have a seat over here at the council table. Okay. Good morning, Your Honors. Amelia Sargent for Appley Lumens Company. This is, in fact, a really simple case. The district court ruled on two separate issues, as you just heard, that Lumens, in the first instance, Lumens shipped over a million dollars' worth of LED panels to GOECO's customers. Those shipments were accepted, and now GOECO has to pay for the goods. It's just that simple. And nothing that GOECO argues today disturbs that ruling. In the second instance, in a second set of motions for summary judgment, the district court found that GOECO failed to meet its burden to provide authenticated, admissible evidence of its damages, which is an essential element of all of its counterclaims, setting aside the Juneau Commission, which, as Judge Bonney noted, that Lumens put in the evidence on that. And what GOECO did instead, basically, in its brief and today, is focus on immaterial facts regarding these allegations that Lumens engaged in a nefarious plot to destroy it. But to cut to the chase on appeal of that lack of damages order, GOECO only had to answer one question, which was what admissible evidence that created a genuine issue of material fact did it, in fact, submit to the district court? It had to be admissible, it had to be material, and it had to actually be submitted to the district court. And GOECO can't answer that question. So briefly, to talk briefly, first, about the shipment of over a million dollars worth of goods to GOECO's customers, nothing that GOECO has argued in this brief or today excuses it from having to pay for that, not even if the MOU applied in some way as a contract for the sale of goods or under the UCC, which we don't concede at all. It's correctly, you know, the MOU says exactly what it says, no more and no less. It talks about non-circumvention. It talks about how GOECO can go out and find new clients. But it doesn't excuse nonpayment. It's very simple. If a buyer accepts goods, it has to pay for those goods. You can find that in UCC 2607 sub 1. And that sort of ends the inquiry entirely on that ruling of the district court. The big dispute seemed to be, though, on the counterclaims. On the counterclaims, correct. So on the counterclaims, the district court really didn't rush to judgment here. You know, it literally said to GOECO, it did say the nanosecond thing in the hearing, but it also said, I need to be spoon-fed what evidence is in the record before me on damages. And it said that, you know, the district court said, spoon-feed me the evidence on damages. And GOECO simply couldn't do it. And what we have that's up on appeal is a very – So why don't you back up just a little bit. What were the damages that GOECO was seeking on each of its counterclaims? So the district court's order, 24-page order, neatly grouped GOECO's damages into several categories. And those categories are basically four, four kind of broad categories. There's lost profits. There's investment losses. There's goodwill damages. And there's commissions on the sales to Juneau Lighting. The lost profits, the dispositive issue on lost profits, is that GOECO can't show evidence of net profits as opposed to gross revenue. And net profits, as Counsel for GOECO conceded, is that business operations, overhead, rents, labor, salaries, that has to be subtracted out from the gross revenue in order to come up with the net profit calculation. And they presented no evidence of that. There's an absence of evidence on net profits. And so Counsel for GOECO, in argumentation in the briefing, GOECO argued, well, you can just assume it's zero. You can assume it's de minimis because there's nothing in the record. That would be error. The district court didn't fall into that trap. The district court said, no, you haven't given me any evidence whatsoever, and therefore I can't make this calculation and the jury couldn't make it either. And that's the dispositive issue on all the lost profits, whether it's the tort claim or a contract claim, whether it's past lost profits or future prospective lost profits. That's a dispositive issue. There's a secondary issue about whether there's evidence of lost sales. And in a couple places in its brief, GOECO mentions, oh, we have this evidence of historical lost sales. That's a sub-issue that you still have a net profits problem, even if you have, for example, evidence of a couple of purchase orders from specialty lighting that weren't filled. But as far as the evidence that it mentions, I just want to say the evidence it mentions in its opening brief at 43 about historical sales, that actually wasn't submitted to the district court either. So if you go back and look, it's not submitted in opposition to our motion for summary judgment on damages. So there were other forms of damages that they were seeking? The other forms of damages, yes, Your Honor, the goodwill and investment damages. The only evidence in the record about what those were or how to categorize them was located in a so-called expert summary of one of GOECO's principals, Mr. Darren Borderland, which the court looked at and considered, and considered that it didn't meet the Daubert standards of FRA 702. That would be reviewed under an abusive discretion standard. But it basically just, you know, the expert report summary, if you look at it, just says investment damages, $300,000. It's really that cursory. And so then in briefing, GOECO also said, oh, well, as far as goodwill damages or investment damages, we can and will present evidence of these damages later at trial. And evidence is required to show loss of goodwill, damages for loss of goodwill. Well, for goodwill, well, you could show evidence of the good name of the business reputation of GOECO in the marketplace, but actually our expert, we put this in on the summary judgment motion, I believe that it's really, goodwill damages is really kind of a proxy for lost profits, and we said that that was going to be an impermissible double dip, because your goodwill damages is basically the business you would have had in the future based on your good name, which is a doubling in a sense of prospective lost profits. So, you know, if you're looking for that kind of evidence, you could have an expert go out and commission some kind of study to see where your business was, how your business was doing in the marketplace, for example, or what sales you would have had in the future based on your business reputation. But again, we just don't have any of that here. And then the same for investment damages, which they claimed were because of the work that GOECO's principals had put in in preparing lumens for the marketplace. But again, no evidence of timesheets, no evidence of travel expenses, no evidence was put into the record on what that investment damages might be. And then the final category of damages was simply this commission on sales that were made to Juneau, and we conceded that point and put in evidence, put in an authenticated admissible evidence, and calculated that out, and that was offset, in fact, from the district court's ruling. So that's it in a nutshell, and that's all I have if the panel has no more questions. What about the argument that the UCC applies to the MOU? We don't believe it does. We think the MOU says what it says, and it's a services contract and not a sales contract. I think as far as what GOECO owes lumens, it doesn't matter if the MOU is subject to the UCC or not, because GOECO still has to pay for the goods. As far as its counterclaims, you know, GOECO has an argument that under the UCC, you can calculate damages in a different way. You don't have to do net profits. You can use UCC 2713, the hypothetical cover statute. It does raise that in its brief. But the hypothetical cover statute doesn't really help GOECO here. First, we would say that argument is waived. They didn't raise the possible calculation of hypothetical cover damages before the district court. It's a mixed question of law and fact, and to raise it now is prejudicial to lumens because we actually have evidence on some of those facts that we didn't put in. So first of all, as far as UCC 2713 goes, it's waived. But second of all, it doesn't work the way GOECO claims it works. GOECO says it allows it to simply take the forward price to specialty and subtract out the contract price that it was going to pay lumens. That's not how the hypothetical cover statute works. The hypothetical cover statute says you take the market price as if GOECO had found cover goods from another manufacturer that would have been similarly situated to lumens, and then you can subtract the price that it would have paid to lumens, but then you also have to subtract out expenses saved in consequence of the breach. We're missing evidence on the market price of another manufacturer's price, and we're missing evidence on expenses saved in consequence of the breach, which would be similar to the net profits that we're missing under the lost profits calculation. And lumens actually had evidence that its expert had testified to that the market price, the price that GOECO would have paid had it covered and sought another set of LED panels, commodity goods from a different manufacturer, had actually fallen, and therefore these damages would be sort of negative. But we didn't put that in because this wasn't raised. All right, thank you, Your Honors. Thank you, again, Your Honors. Yeah, I'm not aware of appellee ever contending that the UCC didn't apply and that this was not a contract for the sale of goods. Talking about the MOU. Right, right. And again, you know, the judge himself said this has to be decided by a jury, and if a jury can decide this, they could decide that it's complete enough, that based on extrinsic evidence that, you know, proper decisions could be made. As far as, again, as damages, counsel is, you know, contending that absolute precision has to be had. And again, I fall back on the UCC, which seems to clearly state that, well, you're going to have to make some adjustments, you know, and perhaps it's not going to be the amount you're claiming could still go to a jury, you know, to decide just what the damage is. This is a million plus was already paid for by GoECO. They're not deadbeats. They didn't withhold this money just to be withholding it. Initial orders were bought and paid for over a million. And then other orders were put in, and it was at that time that you get the you're dead meat comment from one of their principals, which is saying you're gone, okay, even though we were not delinquent at the time. That's replete in the record. We were not delinquent when they did this. It was malicious. It prevented us from getting prospective orders from specialty as to which we could get profits. And at the last hearing, at September 18 hearing on this, the judge at least six times said, there's some damage matters that I'm concerned about. But trust me, if this case is not settled, it is going to trial. There are damage issues that will survive. He said that repeatedly. We did our best to respond to that for the last hearing. But if he would have given specifics, perhaps we could have, you know, fine-tuned and did better at that. So we were misled. Also, at the last hearing, by that time, Paul O'Donnell of specialty, the CEO, he finally sent us what we had been requesting, a spreadsheet on what he expected, you know, to be audited. Actually, he indicated what he had ordered that would have been the same type of product from in November of 15. And the judge just ignored that. I mentioned it at that meeting. And damages was key, a key concern. And he just acted like he never said anything. And we do have that spreadsheet. So in a situation, as far as GoECO owing a million plus, it's my understanding in the law that if a party breaches and it's replete, the record is replete with just heinous conduct by these two principals, if it's such that they're saying, hey, we're going to dishonor this contract, we committed fraud, our opinion is what they're saying, then we have a right to withhold that money until all the issues are decided. I understand your argument. Now you're over. Thank you, Your Honor. You're welcome. Thank you. We appreciate your arguments this morning, both sides. Happy holidays. Yes. To both of you, too, both sides. Thank you. The matter is submitted at this time.
judges: Kelly, Paez, Bade